UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CARLOS BENITEZ JR.,

               Petitioner,

     v.

JAMES KEY,

               Respondent.

Case No. C16-1686-RSL-JPD

REPORT AND RECOMMENDATION

       Petitioner, a state prisoner who is currently confined at Airway Heights Corrections Center in Airway Heights, Washington, seeks relief under 28 U.S.C. § 2254 from a 2010 Skagit County Superior Court judgment and sentence for identity theft, criminal impersonation, and multiple drug and firearm offenses. Respondent has filed an answer to petitioner's habeas petition and submitted relevant portions of the state court record. Petitioner has filed a response to respondent's answer. Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends that petitioner's habeas petition be DENIED, that a certificate of appealability be DENIED, and that this action be DISMISSED with prejudice.

## I.   FACTUAL AND PROCEDURAL HISTORY

The Washington State Court of Appeals ("Court of Appeals"), on direct appeal,

summarized the facts relevant to petitioner's conviction and sentence as follows:

> In 2009, the Skagit County Drug Task Force was investigating a drug operation in Burlington, based in the home of Able Cantu, Jr. and his wife Jessica Gonzalez. Over the course of that operation, officers conducted surveillance, observing a high volume of suspected drug traffic to and from the residence and its detached garage.

> Officers obtained the assistance of a confidential informant, and set up two controlled drug purchases in order to get an introduction to Cantu. During the first buy, on September 4, 2009, the informant purchased methamphetamine. After debriefing the informant, officers became concerned about the presence of firearms inside the house, as well as counter-surveillance being conducted by Cantu's associates outside the house. The informant stated that he observed individuals in the house cutting a kilo of cocaine, and that two of the individuals present were armed with handguns. The informant also told officers that Carlos Benitez, Jr. was present.

> Officers set up a second controlled purchase that occurred on September 17, 2009. The informant again purchased a quantity of methamphetamine, and also inquired about purchasing a machine gun that he had previously discussed with Cantu. An undercover officer who remained outside during the transaction posed as the potential buyer of the machine gun. Cantu told the informant to take the machine gun out to show it to the officer. The officer arranged for the purchase of the gun, despite an extremely high sale price. After the transaction, the informant described the weapons he had observed while inside, including two rifles, a couple shotguns, and pistols. In additional surveillance on September 23, 2009, an officer observed both Benitez and Cantu outside the house. After what appeared to be a drug transaction, the officer followed the apparent purchaser when he left the house, noting he appeared to be under the influence of narcotics.

> On October 24, 2009, Burlington Police, unaffiliated with the drug task force, went to the house while looking for a suspect. The Burlington officers knocked on the door, and Gonzalez gave consent to search for the suspect in the residence. While inside the house, they saw numerous firearms, drug paraphernalia, and possible stolen items. The officers obtained a search warrant for weapons in the house and the garage.

> Although officers knew someone was inside the garage, their initial knocks went unanswered. Eventually, after seeing four males sitting inside through a window and informing them of the search warrant, Cantu opened the door. The garage was cluttered, and there was a bed and a dresser. Officers first spotted a

nylon shoulder holster hanging on the bed post, holding what looked like a real gun, but turned out to be an Airsoft pistol. Under the mattress, officers found a cache of guns, including two illegally shortened shotguns. There were also three rifles found behind the headboard of the bed. And, there was a bag of suspected heroin lying on the floor near the bed, as well as a large digital scale with brown residue on the plate.

After searching the garage for approximately 20 minutes, officers finally spotted Benitez hiding under a blanket, hugging his knees and pretending to be asleep. They ordered Benitez to show his hands, but it took multiple demands before he complied. There were guns and ammunition within arm's reach of the location where Benitez was found. Officers testified the firearms were readily accessible, and that they were concerned by his proximity to them.

Upon initial questioning, Benitez stated that his name was Carlos Mejia, though he later admitted his true name was Carlos Benitez. After detaining Benitez, officers also located a wallet in his pocket, with the identification of an older white male. He stated he had found the wallet, but the cash inside was his. The wallet had $700 of cash in it. The officers also found a sheet of paper that contained the personal information of the owner of the wallet, including a credit card number and expiration date, full name, date of birth, driver's license number and expiration, address, and social security number. The wallet contained other items including a photograph, dated August 24, 2009, of Benitez standing in the garage beside a marijuana plant. It also included gift cards, a phone activation card, a Quest card for public assistance, and a business card for a horticultural supply store that was well known as a locale frequented by individuals purchasing supplies for marijuana growing operations. Officers testified that each of these items had commonly known ties to the drug trade.

Officers continued to search the garage and found other drugs and trafficking paraphernalia. There was a bag of syringes. There was a plastic bag labeled baking soda, a known drug-manufacturing ingredient. They found numerous other drug-related items including Ziploc bags containing a brown substance, another digital scale with residue on it, a dirty mixing bowl with residue, spoons for cooking heroin, and marijuana plants growing inside. A drug detection dog arrived, and along with the search team, identified drugs including heroin, cocaine, methamphetamine, ecstasy, and marijuana. There were numerous apparently stolen goods, including items such as stereos. There was a scanner in the garage which had the numbers for law enforcement frequencies.

The State first charged Benitez on October 28, 2009, with counts of: conspiracy to deliver a controlled substance; possession with intent to manufacture or deliver a controlled substance with firearm and school zone enhancements; two counts of possession with intent to manufacture or deliver; unlawful possession of a firearm in the first degree; and possession of a stolen firearm.

On May 21, 2010, after failing to reach a plea agreement with Benitez, the State filed a second amended information that added charges. It included the following counts: conspiracy to deliver a controlled substance (Count I); three counts of possession with intent to manufacture or deliver a controlled substance with firearm and school zone enhancements (Counts II-IV); manufacture of marijuana (Count V); criminal impersonation in the first degree (Count VI); identity theft in the first degree (Count VII); seven counts of unlawful possession of a firearm in the first degree (Counts VIII, X-XIII, XV, XVII); possession of a stolen firearm (Count IX); and two counts of unlawful possession of short-barreled shotgun or rifle (Counts XIV, XVI). The State also filed a third amended information in June 2010, correcting clerical errors in the second amended information. The case proceeded to trial on June 28, 2010.

The informant testified that Benitez took care of the garage for Cantu and did small transactions for him; that Benitez knew where things were, knew how to find Cantu, and had cooked drugs as part of the operation. The informant also testified that guns and drug trafficking go hand in hand and are important to make buyers feel they cannot steal from the operation.

There was evidence from the owner of the wallet about when he lost it and what it contained at that time. There was testimony from another man that he had five firearms and other items stolen from his house. One of the pistols found in the drug house was registered to him, and he recognized the gun and the holster. There was evidence that the school district has a designated bus stop within 100 feet of the residence. Benitez stipulated that the stop was within 1,000 feet. He also stipulated to the fact that he had a prior serious felony conviction for the strategic decision not to admit that prior conviction to the jury, and that his conviction constituted recent recidivism for the purpose of an exceptional sentence.

The jury returned guilty verdicts on all 17 counts, as well as the two enhancements each on three counts. Benitez had four prior adult and four prior juvenile convictions, and was on community custody at the time of the offenses, which impacted his standard range sentence. The standard range calculation was 765 to 992 months. On August 25, 2010, the trial court sentenced Benitez to an exceptional sentence downward of 368 months. The trial court entered written findings of fact and conclusions on law on the exceptional sentence. The State objected to those findings of fact, but did not appeal that sentence.

Dkt. 12, Ex. 2 at 2-6.

The Court of Appeals affirmed on direct appeal, and the Washington Supreme Court summarily denied review. *Id.*, Exs. 2 & 8. Petitioner filed a post-conviction motion in the

REPORT AND RECOMMENDATION - 4

superior court, seeking to vacate his judgment and sentence. *Id.*, Exs. 10 & 11. The superior court modified the sentence on Count I from 120 months to 12 months, but it did not amend the overall total sentence. *Id.*, Ex. 15. The court then transferred the post-conviction motion to the Court of Appeals for consideration as a personal restraint petition ("PRP"). *Id.*, Ex. 16. The Court of Appeals denied the PRP, and petitioner filed a motion for discretionary review in the Washington Supreme Court. *Id.*, Exs. 20 & 21. The Commissioner of the Washington Supreme Court denied review, and petitioner filed a motion to modify the Commissioner's ruling. *Id.*, Exs. 22 & 23. The Washington Supreme Court denied the motion to modify, and petitioner timely filed the instant petition for writ of habeas corpus. *Id.*, Ex. 25; Dkt. 1.

## II.     GROUNDS FOR RELIEF

Petitioner identifies the following grounds for habeas relief:

1.  Due process violation by prosecutorial vindictiveness.

2.  Due process violation for State's failure to prove each of the elements of Unlawful Possession of a Stolen Firearm.

3.  Sixth Amendment violation for trial counsel's failure to object to inadmissible and prejudicial evidence.

4.  Due process violation for the State's failure to prove that petitioner constructively possessed drugs and firearms.

5.  Due process violation for the State's failure to prove that petitioner acted as an accomplice.

6.  Due process violation for the State's failure to prove each of the elements of Conspiracy to Deliver a Controlled Substance.

REPORT AND RECOMMENDATION - 5

1     7. Due process violation for trial court's failure to grant a mistrial based on a prejudiced

2         jury.

3     8. Sixth Amendment violation for trial counsel's failure to move to suppress fruits of the

4         unlawful search and seizure.

5     9. Due process violation based on the State introducing inadmissible and prejudicial

6         evidence.

7     10. Fifth Amendment double jeopardy violation for entering multiple convictions for

8         Possession with Intent to Manufacture or Deliver a Controlled Substance, which arose

9         from a violation of a single statutory provision.

10     11. Sixth Amendment violation by trial counsel's representation of conflicting interests.

11 Dkt. 6 at 5-22.

12     Respondent concedes that petitioner properly exhausted Grounds 1-8 and 10-11. Dkt. 10

13 at 9. Respondent asserts that Ground 9 is procedurally barred because petitioner waived the

14 argument by failing to object at trial. *Id.* The issue of waiver will be discussed in conjunction

15 with the merits of Ground 9 below.

16                III.    <u>STANDARD OF REVIEW</u>

17     Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

18 petition may be granted with respect to any claim adjudicated on the merits in state court only if

19 (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly

20 established federal law, as determined by the Supreme Court, or (2) the decision was based on an

21 unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

22 In considering claims pursuant to § 2254(d), the Court is limited to the record before the state

23 court that adjudicated the claim on the merits, and the petitioner carries the burden of proof.

1  *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011); *see also Gulbrandson v. Ryan*, 738 F.3d 976,

2  993 (9th Cir. 2013).  "When more than one state court has adjudicated a claim, [the Court

3  analyzes] the last reasoned decision."  *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir.

4  2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

5      Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

6  only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

7  question of law, or if the state court decides a case differently than the Supreme Court has on a

8  set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

9  Under the "unreasonable application" clause, a federal habeas court may grant the writ only if

10  the state court identifies the correct governing legal principle from the Supreme Court's

11  decisions, but unreasonably applies that principle to the facts of the prisoner's case.  *See id*. at

12  407-09.  The Supreme Court has made clear that a state court's decision may be overturned only

13  if the application is "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

14  The Supreme Court has further explained that "[a] state court's determination that a claim lacks

15  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

16  correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011)

17  (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

18      Clearly established federal law, for purposes of AEDPA, means "the governing legal

19  principle or principles set forth by the Supreme Court at the time the state court render[ed] its

20  decision."  *Lockyer*, 538 U.S. at 71-72.  This includes the Supreme Court's holdings, not its

21  dicta.  *Id.*  "If no Supreme Court precedent creates clearly established federal law relating to the

22  legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary

23

to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

With respect to § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(d)(2)); *see also Lockyer*, 538 U.S. at 75 ("The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable."). The Court presumes the state court's factual findings to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." *Miller-El*, 545 U.S. at 240 (quoting 28 U.S.C. § 2254(e)(1)).

IV.     DISCUSSION

A.     Prosecutorial Vindictiveness (Ground 1)

Petitioner claims that the prosecutor violated due process by charging him with additional crimes because he exercised his right to proceed to trial. Dkt. 6 at 5; Dkt. 18-1 at 27. The Supreme Court has recognized that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). Thus, there are circumstances that give rise to a presumption that the prosecutor or sentencing judge acted with unconstitutional vindictiveness in charging or sentencing a criminal defendant. *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969) (holding that due process "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial"); *Blackledge v. Perry*,

417 U.S. 21, 27 (1974) (holding that there was a "realistic likelihood of vindictiveness" where a prosecutor reindicted a convicted misdemeant on a felony charge after the defendant invoked an appellate remedy). The Supreme Court has held, however, that the presumption of vindictiveness does not apply to charging decisions made before trial. *Goodwin*, 457 U.S. at 380-84 (holding that presumption of prosecutorial vindictiveness is not warranted where prosecutor brought felony charge in place of original misdemeanor charges after defendant requested a jury trial); *Bordenkircher*, 434 U.S. at 363-65 (holding that there was no due process violation where prosecutor carried out threat, made during plea negotiations, to bring additional charges against the defendant, who refused to plead guilty to the original charges). Where the presumption does not apply, a defendant must affirmatively prove actual vindictiveness. *Wasman v. United States*, 468 U.S. 559, 569 (1984).

The Court of Appeals rejected petitioner's prosecutorial vindictiveness claim on direct appeal. Dkt. 12, Ex. 2 at 7-12. This decision is neither contrary to nor an unreasonable application of clearly established federal law. The record establishes that during plea negotiations, the prosecutor informed petitioner and his counsel that she would file additional charges if he proceeded to trial. Dkt. 12, Ex. 27 at 4-6. Petitioner rejected the plea deal and acknowledged in open court that he understood the potential impact of the additional charges on any sentence. *Id.* at 6. Because the additional charges were added as a result of failed plea negotiations and before trial, there is no presumption of vindictiveness. *See Bordenkircher*, 434 U.S. at 363-65. The only suggestion in the record of actual vindictiveness is petitioner's claim that trial counsel told him the prosecutor had expressed "ill feelings" about a second degree domestic violence assault case against him. Dkt. 18 at 7. This claim is insufficient to establish actual vindictiveness. Ground 1 should be DENIED.

B.     Sufficiency of the Evidence (Grounds 2, 4, 5, and 6)

Petitioner challenges the sufficiency of the evidence supporting his convictions, arguing there is insufficient evidence to prove that he knowingly possessed a stolen firearm (Ground 2); was armed while in possession of controlled substances (Ground 4); acted as an accomplice (Ground 5); and conspired to deliver a controlled substance (Ground 6). Dkt. 6 at 7, 10, 12, 13; Dkt. 18-1 at 13-22. The Court will consider each of petitioner's claims below.

1.     *Legal Standard*

The Constitution forbids the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 361-64 (1970). In reviewing a claim of insufficiency of the evidence to support a conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution. *See Gordon v. Duran*, 895 F.2d 610, 612 (9th Cir. 1990). Review is sharply limited, and the federal court owes great deference to the trier of fact. *Wright v. West*, 505 U.S. 277, 296-97 (1992). The reviewing court must keep in mind the requirements of state law: "the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). Evidence is sufficient if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. For example, the jury is entitled to believe the State's evidence and to disbelieve the defense's evidence. *Wright*, 505 U.S. at 296. On habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 132 S. Ct. 2060, 2062 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1 (2011) (quoted source omitted)).

2.    *Unlawful Possession of a Stolen Firearm (Ground 2)*

The jury found that petitioner unlawfully possessed a stolen firearm.  Under Washington law, "A person is guilty of possessing a stolen firearm if he or she possesses, carries, delivers, or is in control of a stolen firearm."  RCW 9A.56.310(1).  The person must knowingly possess the stolen property knowing that it has been stolen.  RCW 9A.56.140(1).  Knowledge may be established with circumstantial evidence, and "the specific criminal intent of the accused may be inferred from the conduct where it is plainly indicated as a matter of logical probability."  *State v. Delmarter*, 94 Wash. 2d 634, 638 (1980).  "[A]ctual knowledge is unnecessary.  It is sufficient if [the defendant] had knowledge of facts sufficient to put him on notice that [the property was] stolen."  *State v. Rockett*, 6 Wash. App. 399, 402 (1972); *see also State v. Salle*, 34 Wash. 2d 183, 193-94 (1949) ("[I]t will suffice if there is constructive knowledge through notice of facts and circumstances from which guilty knowledge may fairly be inferred."); *State v. Pruitt*, 145 Wash. App. 784, 790 (2008) (constructive knowledge sufficient for conviction of possession of stolen property).

The Court of Appeals concluded that there was sufficient evidence to convict petitioner of possessing a stolen firearm:

> The State presented evidence from the rightful owner of the firearm that it had been stolen nearly a year before officers found it in the garage near Benitez. Benitez does not dispute that the firearm was stolen, but argues the State failed to prove he had knowledge that it was stolen.  He correctly asserts that bare possession of a stolen firearm is insufficient to justify a conviction.  *State v. McPhee*, 156 Wn. App. 44, 62, 230 P.3d 284, *review denied*, 169 Wn. 2d 1028, 241 P.3d 413 (2010).  "'However, possession of recently stolen property in connection with other evidence tending to show guilt is sufficient.'"  *Id.* (quoting *State v. Couet*, 71 Wn. 2d 773, 775, 430 P.2d 974 (1967)).

The jury received an instruction on knowledge that provided, in part:

> If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact.

> This instruction amounted to a definition of constructive knowledge, entitling the jury to draw reasonable inferences about what Benitez did or did not know. While there was no direct evidence to prove Benitez's knowledge of the gun's origin, the State did present ample circumstantial evidence to enable a rational trier of fact to conclude Benitez had constructive knowledge that the firearm was stolen. It was established that he was a part of the drug trafficking operation. The informant testified it was known that the drug transactions frequently involved stolen property. One of the task force officers gave testimony that reinforced this proposition, establishing that stolen property like electronics, power tools, or firearms were used by the drug dealers as trading commodities. There were car stereos found in the garage with cut cords and wires. There were ledgers, one of which showed Benitez had been a part of the trafficking activity and had made exchanges for other such property that was found in the garage. Benitez was also found to be in actual possession of a wallet belonging to someone else that contained the credit card, identification, and social security card of another person. The credit card had been recently used to purchase property and gift cards, much of which was found in the garage along with corresponding packaging.

> Taking this evidence in the light most favorable to the State, there was sufficient evidence for a rational trier of fact to find that Benitez had information that would lead a reasonable person to believe the firearms were stolen. The jury was entitled to conclude that he had constructive knowledge and knowingly possessed a stolen firearm.

Dkt. 12, Ex. 2 at 12-13.

Petitioner argues that the State's evidence was insufficient to prove he "actually knew" the firearm was stolen. Dkt. 18-1 at 15. Petitioner maintains that the Court of Appeals held the State to a lower standard of proof by concluding that he "had information to believe" the firearms were stolen, rather than "actual subjective knowledge" that the firearm was stolen. *Id.* As noted above, however, constructive knowledge is sufficient to sustain a conviction for possession of a stolen firearm. *See Salle*, 34 Wash. 2d at 193-94; *Pruitt*, 145 Wash. App. at 790; *Rockett*, 6 Wash. App. at 402. The undisputed evidence the Court of Appeals cites amply

supports its determination.  Petitioner fails to show that the state court decision was contrary to or an unreasonable application of clearly established federal law.  Ground 2 should be DENIED.

      3.    *Possession of Drugs and Firearms (Ground 4)*

The jury found that petitioner was armed with a firearm during the commission of his drug crimes, specifically possession with intent to manufacture or deliver heroin, cocaine, and Ecstasy.  The Court of Appeals accurately summarized Washington law in concluding that there was sufficient evidence to convict petitioner of possession of controlled substances with a firearm enhancement:

> Benitez argues the State failed to prove beyond a reasonable doubt that he was armed with a firearm when officers found him in the garage near the heroin, cocaine, and ecstasy.  The State charged him with three counts of possession with intent to deliver (counts II, III, and IV).  And, on each count the jury returned special verdicts finding that Benitez was armed with a firearm at the time of the crimes, in violation of RCW 9.94A.533 and 9.94A.825.

> A person is "armed" if a weapon is "easily accessible and readily available for use, either for offensive or defensive purposes." *State v. Valdobinos*, 122 Wn. 2d 270, 282, 858 P.2d 199 (1993).  In addition to this test, where a weapon is constructively possessed, there must also be a two part analysis, requiring "a nexus between the weapon and the defendant and between the weapon and the crime." *State v. Schelin*, 147 Wn. 2d 562, 567-68, 55 P.3d 632 (2002).  "The nexus requirement refines the analysis and serves to place 'parameters . . . on the determination of when a defendant is armed, especially in the instance of a continuing crime such as constructive possession' of drugs." *State v. Gurske*, 155 Wn. 2d 134, 140-41, 118 P.3d 333 (2005) (alteration in original) (quoting *Schelin*, 147 Wn. 2d at 568).  Here, there was a nexus between Benitez and the firearms.  At the time Benitez was found, guns were located on the bed and behind the headboard within his arm's reach, easily accessible and readily available at the time the police found him.

> There must also be a nexus between the weapons and the crime.  As the court in *Schelin* noted:

> > [T]he mere presence of a weapon at a crime scene may be insufficient to establish the nexus between a crime and a weapon.  If an assault with a beer bottle occurs in a kitchen, a defendant is not necessarily "armed" with a deadly weapon because knives are kept in the kitchen.  One should examine the nature of the crime, the type of weapon, and the

circumstances under which the weapon is found (e.g., whether in the open, in a locked or unlocked container, in a closet on a shelf, or in a drawer).

*Schelin*, 147 Wn. 2d at 570. Here, the crime underlying the firearm enhancements was possession with intent to deliver. The testimony from both the narcotics task force detective and the informant established that firearms often go hand in hand with drug dealing. They are used for security and to deter people from trying to steal drugs, property, or money from the operation. The facts in *Schelin* are similar and that court's reasoning and holding are dispositive:

> [T]he evidence established Schelin was in close proximity to a loaded gun which he constructively possessed to protect his marijuana grow operation. When we apply the nexus test . . . the inferences support a conclusion that Schelin was "armed." Schelin admitted to being in close proximity to an "easily accessible and readily available" deadly weapon. The jury was entitled to infer he was using the weapon to protect his basement marijuana grow operation. Schelin stood near the weapon when police entered his home and could very well have exercised his apparent ability to protect the grow operation with a deadly weapon, to the detriment of the police.

*Id.* at 574-75. The evidence in Benitez's case is sufficient to support the jury's conclusion that he was armed with the firearms, by virtue of his close proximity to them. The weapons were easily accessible and readily available. And, the jury was similarly entitled, based on the proximity of the drugs at issue and the totality of the evidence about the drug dealing operation, to conclude that there was a connection between the firearms and the counts of drug possession. The jury was entitled to infer that the firearms were used in furtherance of the drug dealing operation.

Dkt. 12, Ex. 2 at 14-16. Later in the opinion, the Court of Appeals continued:

> "Possession may be actual or constructive, and constructive possession can be established by showing the defendant had dominion and control over the [property] or over the premises where the [property] was found." *State v. Echeverria*, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997). The ability to reduce an object to actual possession is an aspect of dominion and control. *Id.* Other aspects include knowledge of the illegal items on the premises and evidence of residency or tenancy. *State v. Jeffrey*, 77 Wn. App. 222, 227, 889 P.2d 956 (1995).
>
> Here, the evidence showed Benitez was staying in the garage, where a mattress and dresser were set up. It is undisputed that myriad drugs and weapons were found in the garage. The informant testified Benitez took care of the garage, knew where things were located, and helped Cantu with small transactions, including, for example, going to get the piece of the machine gun. Benitez was

present during at least one of the drug transactions, his name appears in one of the ledgers that was found, and he was also identified in a photograph standing beside a marijuana plant. Taking this evidence in the light most favorable to the State, the jury had ample support for its conclusion that Benitez possessed the drugs and firearms found in the garage.

*Id.* at 22-23.

Petitioner argues that he could not be convicted based on a theory of constructive possession of drugs or firearms because the evidence showed that he only stayed in the garage temporarily and there was no evidence to support his residence or tenancy. Dkt. 18-1 at 17. He contends that the evidence showed Mr. Cantu had absolute dominion and control over the garage, drugs were found on Mr. Cantu's person and throughout the garage, none of petitioner's personal possessions were found in the garage, petitioner did not have a key to the garage, and Ms. Gonzales testified that Mr. Cantu slept on the bed in the garage. *Id.* Petitioner likens his case to *State v. Callahan*, 77 Wash. 2d 27 (1969), where there was insufficient evidence to establish constructive possession where the defendant had been staying on the premises for two or three days and two books, two guns, and a broken scale were found that belonged to the defendant. Dkt. 18-1 at 17. Petitioner also argues that the Court of Appeals misapplied the law defining the elements of the offense, but he does not explain how the Court of Appeals erred. *Id.* at 18.

Petitioner's arguments are unavailing, particularly because the evidence must be viewed in the light most favorable to the State. Thus, the fact that there was some contradictory evidence presented does not provide grounds for federal habeas relief. Ms. Gonzales testified that petitioner started staying in the garage in June 2009, several months before his arrest. Dkt. 12, Ex. 32 at 317-19. In September 2009, he moved a bed into the garage. *Id.* at 323. Throughout this time, he used the bathroom and laundry facilities in the main house. *Id.* at 321.

Ms. Gonzales testified that petitioner told her he wanted to stay in the garage because there were warrants for his arrest. *Id.* at 324. She testified that she saw petitioner run inside the garage when law enforcement vehicles would drive past the house. *Id.* at 325. Ms. Gonzales also testified that Mr. Cantu slept in the main house, not in the garage. *Id.* at 320. This evidence is sufficient to show petitioner's tenancy in the garage. Furthermore, the additional evidence the Court of Appeals discussed supports the jury's determination that petitioner possessed the drugs and firearms found in the garage. The state court decision is neither contrary to nor an unreasonable application of clearly established federal law. Likewise, the decision is not based on an unreasonable determination of the facts.

*Callahan*, the case petitioner cites, does not change this conclusion. In that case, the defendant had been staying on the houseboat where narcotics were found for only two or three days, and another person testified that the drugs belonged to him and that he was the only one who had control over them, not the defendant. By contrast, petitioner had been staying in the garage for months and had moved in his own bed. In addition, there was no testimony that the drugs belonged solely to Mr. Cantu; instead, there was testimony that the garage was open for business even when Mr. Cantu was not present and that petitioner distributed drugs in the garage when Mr. Cantu was busy. Dkt. 12, Ex. 31 at 251; *id.*, Ex. 32 at 310-11, 389-91. Ground 4 should be DENIED.

4. *Accomplice liability (Ground 5)*

The jury found that petitioner acted as an accomplice to Mr. Cantu. Under Washington law, a person is an accomplice if, "[w]ith knowledge that it will promote or facilitate the commission of the crime, he or she: (i) Solicits, commands, encourages, or requests such other person to commit it; or (ii) Aids or agrees to aid such other person in planning or committing it

. . . ." RCW 9A.08.020(3)(a). "[A] person is not an accomplice merely because he was present at the scene and knew that a crime was being committed." *State v. Wilson*, 95 Wash. 2d 828, 832 (1981). "To prove that one present is an aider, it must be established that one is 'ready to assist' in the commission of the crime." *State v. Rotunno*, 95 Wash. 2d 931, 933 (1981) (citation omitted).

The Court of Appeals concluded that there was sufficient evidence to convict petitioner of aiding Mr. Cantu in the commission of the crimes. Dkt. 12, Ex. 2 at 23-24. The Court of Appeals pointed to evidence that petitioner took care of the garage, knew where things were located, and helped Mr. Cantu with small transactions, including going to get the piece of the machine gun that was sold to the undercover officer. *Id.* at 23. The court also noted that petitioner was present during at least one drug transaction, his name appears in one of the legers that was found, and he was identified in a photograph standing beside a marijuana plant in the garage. *Id.*

Petitioner argues that the Court of Appeals misapplied the law by concluding that he acted as an accomplice based only on evidence that he was present and had knowledge of the drug transactions. Dkt. 18-1 at 19-20. Petitioner highlights evidence in the record that is favorable to him, *id.*, but he does not establish any error in the Court of Appeals' citation to portions of the record that support the jury's conclusion. Given that the evidence must be viewed in the light most favorable to the State, the Court of Appeals' decision is based on a reasonable determination of the facts, and it is neither contrary to nor an unreasonable application of clearly established federal law. Ground 5 should be DENIED.

1          5.      *Conspiracy (Ground 6)*

2          The jury found that petitioner conspired to deliver a controlled substance.  Under

3  Washington law, "A person is guilty of criminal conspiracy when, with intent that conduct

4  constituting a crime be performed, he or she agrees with one or more persons to engage in or

5  cause the performance of such conduct, and any one of them takes a substantial step in pursuance

6  of such agreement."  RCW 9A.28.040(1).  A formal agreement is not necessary for the formation

7  of a conspiracy; rather, "[a]n agreement can be shown by a 'concert of action, all the parties

8  working together understandingly, with a single design for the accomplishment of a common

9  purpose.'"  *State v. Smith*, 65 Wash. App. 468, 471 (1992) (quoted source omitted).  While the

10  threshold to show a "substantial step" in a conspiracy context is lower than for attempt, it still

11  requires a manifestation "that the conspiracy is at work, and is neither a project still resting

12  solely in the minds of the conspirators nor a fully completed operation no longer in existence."

13  *State v. Dent*, 123 Wash. 2d 467, 475 (1994) (internal quotation marks and citation omitted).

14  Preparatory conduct that furthers the ability of the conspirators to carry out the agreement can be

15  "a substantial step in pursuance of [the] agreement."  *Id.* at 477.  Conspiracy to deliver a

16  controlled substance specifically requires the involvement of at least three people, because the

17  delivery itself involves two people and a conspiracy must involve a third person other than those

18  involved in the delivery.  *State v. McCarty*, 140 Wash. 2d 420, 426 (2000).

19          After noting the legal standard for conspiracy, the Court of Appeals concluded that

20  sufficient evidence supported the jury's determination that several individuals, including

21  petitioner, were working together in concert to produce, process, and sell the controlled

22  substances.  Dkt. 12, Ex. 2 at 24.

23

Petitioner argues that the only bases for the conspiracy offense are the September 4 and 17, 2009 transactions. Dkt. 18-1 at 21. He contends that on September 4, 2009, the only people involved were Mr. Cantu, the confidential informant, and the confidential informant's friend. *Id.* He also asserts that on September 17, 2009, the only people involved were Mr. Cantu and the confidential informant. *Id.* According to petitioner, although the confidential informant testified that petitioner retrieved a piece of the machine gun during the second transaction, the record shows that Mr. Cantu and the informant went into the residence and emerged with the machine gun. *Id.* Petitioner contends that the Court of Appeals unreasonably concluded that petitioner conspired to deliver a controlled substance because the evidence showed only that he had knowledge and presence. *Id.*

Viewing the evidence in the State's favor, the record supports the Court of Appeals' decision. There was testimony establishing that Mr. Cantu ran a drug trafficking organization out of the garage that involved numerous people. *See, e.g.*, Dkt. 12, Ex. 30 at 29-31; *id.*, Ex. 31 at 169, 208-10, 247-257; *id.*, Ex. 32 at 286-88, 381-86, 388, 398, 402. There was also testimony establishing that petitioner did more than merely reside in the garage. The confidential informant testified that petitioner handled "smaller affairs," including taking care of the garage for Mr. Cantu, knowing where things were, knowing where Mr. Cantu was, fronting drugs to people, and preparing syringes of narcotics for people who came to trade for drugs. *Id.*, Ex. 32 at 388-92, 401, 410-11, 414, 418. The confidential informant also testified—contrary to petitioner's assertions—that at the direction of Mr. Cantu, petitioner accompanied the confidential informant into the main house and found a missing piece of the machine gun for him. *Id.*, Ex. 32 at 413. This evidence supports the Court of Appeals' decision that petitioner

1  conspired with Mr. Cantu and others to deliver controlled substances.  Petitioner has not shown

2  that he is entitled to relief under § 2254(d).  Ground 6 should be DENIED.

3  C.    Ineffective Assistance of Counsel (Grounds 3 and 8)

4        Petitioner claims that his trial counsel provided constitutionally deficient representation

5  when she failed to object to inadmissible and prejudicial evidence (Ground 3) and failed to move

6  to suppress the evidence that was obtained during the search of Mr. Canto's residence and garage

7  (Ground 8).  Dkt. 6 at 8, 17; Dkt. 18 at 28-34; Dkt. 18-1 at 1-3.  The Court will discuss each

8  claim below.

9        1.    *Legal Standard*

10       The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

11  counsel.  *Strickland v. Washington*, 466 U.S. 668 (1984).  Claims of ineffective assistance of

12  counsel are evaluated under the two-prong test set forth in *Strickland*.  Under *Strickland*, a

13  defendant must prove that (1) counsel's performance was deficient and, (2) the deficient

14  performance prejudiced the defense.  *Id.* at 687.

15       With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's

16  performance fell below an objective standard of reasonableness.  *Id.* at 688.  Judicial scrutiny of

17  counsel's performance must be highly deferential.  *Id.* at 689.  "A fair assessment of attorney

18  performance requires that every effort be made to eliminate the distorting effects of hindsight, to

19  reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

20  counsel's perspective at the time."  *Id.*  In order to prevail on an ineffective assistance of counsel

21  claim, a petitioner must overcome the presumption that counsel's challenged actions might be

22  considered sound trial strategy.  *Id.*

23

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance.  In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)).

While the Supreme Court established in *Strickland* the legal principles that govern claims of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate whether defense counsel's performance fell below the *Strickland* standard.  *Richter*, 562 U.S. at 101.  Rather, when considering an ineffective assistance of counsel claim on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.*; *see also Burt v. Titlow*, 134 S. Ct. 10, 18 (2013).  "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101.  Thus, federal habeas review of a state court's adjudication of an ineffective assistance of counsel claim is "doubly deferential." *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 566 U.S. 111, 123 (2009)).

2.    *Failure to Object to Inadmissible and Prejudicial Evidence (Ground 3)*

Petitioner claims that his trial counsel was ineffective because she failed to object to the admission of testimony that he had outstanding warrants, testimony regarding gang activity at the garage, and a photograph of him holding a toy gun.  Dkt. 18 at 31-32.  Petitioner raised this claim in his statement of additional grounds on direct appeal, but the Court of Appeals did not

address it, instead discussing a different ineffective assistance of counsel claim that petitioner does not bring here.[1] *See* Dkt. 12, Ex. 2 at 24-25; *id.*, Ex. 6 at 11-17.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."). This presumption applies even where "the state court addresses some of the claims raised by a defendant but not a claim that is later raised in a federal habeas proceeding." *Johnson v. Williams*, 568 U.S. 289, 293 (2013). Petitioner makes no argument to overcome the presumption that the Court of Appeals rejected Ground 3 on the merits. Accordingly, AEDPA deference applies, and to prevail, petitioner must show "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98; *see also Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) ("[W]hen the state court does not supply reasoning for its decision, we are instructed to engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable.") (citation and internal quotation marks omitted).

Petitioner first complains that the prosecutor introduced testimony that, at the time of his arrest, he had outstanding warrants. *See, e.g.*, Dkt. 12, Ex. 31 at 83, 164; *id.*, Ex. 32 at 324-25; *id.*, Ex. 34 at 773-74. Although evidence of other crimes, wrongs, or acts, is inadmissible to prove the character of a person to show action in conformity therewith, it may be admissible for other purposes. Wash. R. Evid. 404(b). The evidence was introduced to explain why petitioner initially gave a false name to the arresting officers, *i.e.*, to avoid arrest on the outstanding

---

[1] In his PRP, petitioner challenged the admission of the same evidence under a theory of due process, rather than ineffective assistance of counsel. He raises this due process claim here in Ground 9, which is discussed below.

1    warrants. Dkt. 12, Ex. 31 at 83, 164. The evidence was reiterated to explain why petitioner was

2    staying in the garage and to support the State's argument that he was living there. *Id.*, Ex. 32 at

3    324-25; *id.*, Ex. 34 at 773-74. The evidence that petitioner had outstanding warrants was

4    properly admitted under Rule 404(b). As such, counsel was not ineffective for failing to object.

5           Next, petitioner complains that the prosecutor introduced testimony that the garage is a

6    known "gang house" and had gang graffiti on the walls, that Mr. Cantu's "gang" was "well

7    organized," that law enforcement knew Mr. Cantu associated with a "gang" that "dealt in stolen

8    property, drugs, weapons," and that different colors on zip-lock baggies containing drugs—like

9    those that were recovered from the garage—indicated they were from different gangs. Dkt. 12,

10    Ex. 30 at 40; *id.*, Ex. 31 at 73, 88, 183; *id.*, Ex. 32 at 425; *id.*, Ex. 33 at 628, 645. Petitioner

11    contends that this evidence would have been excluded if his counsel had objected because it

12    portrayed him as an individual with a criminal character. Dkt. 18 at 31. But even if counsel's

13    performance fell below an objectively reasonable standard, petitioner fails to satisfy the

14    prejudice prong of *Strickland*. Given the other evidence regarding the criminal organization and

15    petitioner's role in the organization, it is unlikely that the outcome of trial would have been

16    different if counsel had objected and the testimony had been excluded. Thus, petitioner has not

17    shown ineffective assistance of counsel.

18           Finally, petitioner complains that the prosecutor introduced a photograph taken on

19    October 19, 2009, that showed him standing in the garage holding an air rifle that looked like the

20    one recovered from garage on the night of his arrest. Dkt. 12, Ex. 34 at 731-32. Petitioner

21    contends this photograph was inadmissible under Rule 404(b) because it portrayed him as an

22    individual with a criminal character. Dkt. 18 at 31. The Court is not persuaded that a

23    photograph of petitioner with a toy gun would be inadmissible under Rule 404(b) given that the

photograph ties him to the garage and supports the State's theory that he was hiding there. But even if petitioner's counsel could have objected, her failure to do so did not fall below an objective standard of reasonableness or prejudice plaintiff.

In sum, because petitioner has not shown a violation of *Strickland*, he has not established reversible error under AEDPA's more deferential standard of review. Ground 3 should be DENIED.

### 3.    *Failure to Move to Suppress (Ground 8)*

Petitioner argues that trial counsel was ineffective because she failed to move to suppress evidence that he claims was obtained as a result of an unlawful search of the house, which led to the warrant for the search of the garage. Dkt. 6 at 17. The Fourth Amendment prohibits the admission of evidence obtained without a warrant. *United States v. Calandra*, 414 U.S. 338, 354 (1974); *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004). A criminal defendant has the burden of establishing his standing to challenge a search or seizure on Fourth Amendment grounds. *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007). A defendant must demonstrate that he "had an expectation of privacy in the property searched" and that his expectation was reasonable. *United States v. Reyes-Bosque*, 596 F.3d 1017, 1026 (9th Cir. 2010) (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). A defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990).

A warrantless entry and search does not violate the Fourth Amendment "when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of the evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). When one occupant

consents, and a co-occupant expressly refuses consent, any warrantless search is unreasonable and invalid to the co-occupant. *Id.*; *see also United States v. Moore*, 770 F.3d 809, 811 (9th Cir. 2014) (warrantless search valid where fiancée of defendant consented to search and defendant, who was present, did not expressly refuse to allow the search).

The Court of Appeals rejected petitioner's claim, finding that he did not have standing to challenge the search of the house, and therefore counsel could not have been ineffective in failing to raise the argument:

> A person has standing to challenge a search under the Fourth Amendment and article I, section 7 of the State Constitution requires only if he or she has a legitimate expectation of privacy in the area searched. *State v. Jones*, 146 Wn. 2d 328, 334-35, 45 P.3d 1062 (2002). In Washington, however, a person who does not have a legitimate expectation of privacy may still be able to assert automatic standing if (1) possession is an essential element of the offense charged and (2) the defendant was in possession of the contraband at the time of the search or seizure. *State v. Evans*, 159 Wn. 2d 402, 406-07, 150 P.3d 105 (2007). Benitez, who did not live in the house, does not establish that he had a legitimate expectation of privacy in its contents. And while Benitez was convicted of possession of drugs and guns, these items were found during a warrant-based search of the garage, not the house.

Dkt. 12, Ex. 20 at 5. In the alternative, the Court of Appeals ruled that even if petitioner had standing, there were no grounds upon which to challenge the search, explaining:

> Warrantless searches are presumed unlawful unless an exception to the warrant requirement applies. *State v. Grande*, 164 Wn. 2d 135, 141, 187 P.3d 248 (2008). Consent is a recognized exception to the warrant requirement. *State v. Reichenbach*, 153 Wn. 2d 126, 131, 101 P.3d 80 (2004). Once one person gives valid consent to enter, that consent is valid against a cohabitant who possesses equal control only while the cohabitant is absent. *State v. Walker*, 86 Wn. App. 857, 860-61, 941 P.2d 1 (1997). When a cohabitant is present, officers must affirmatively request the cohabitant's consent. *Walker*, 86 Wn. App. at 861.
>
> Gonzales, one of the renters of the house, consented to the search. Benitez argues that her consent was invalid as to him because he was a "cohabitant" that had "equal control" over the house and was present at the time of the search. The record does not support this claim. Benitez, who slept in the garage, was neither a cohabitant of the house, nor was he present such that officers could have requested his consent. In fact, the record shows that officers only located Benitez

after they obtained a search warrant for the garage and searched for approximately 20 minutes, at which point they "finally spotted Benitez hiding under a blanket, hugging his knees and pretending to be asleep." This effort to hide negates any claim that Benitez was "present" such that his consent could have been sought.

*Id.* at 6.

The Commissioner also rejected petitioner's claim that his consent was required because he was a cohabitant of the house, reasoning:

[T]his rule only applies to a cohabitant who has equal control over the premises and is present when consent is sought. As the acting chief judge observed, Mr. Benitez at most was sleeping in the garage. There was no evidence he was a cohabitant of the residence, and even if he was, he was not present in the residence when police sought permission to search it. The [police] then obtained a valid warrant to search the garage, and only then did they discover the presence of Mr. Benitez, who was trying to hide. Mr. Benitez cites no authority remotely suggesting the original consent was ineffective in these circumstances. Mr. Benitez thus fails to show that counsel was ineffective in not moving to suppress the search based on lack of consent.

*Id.*, Ex. 22 at 3.

Petitioner argues that he has standing to challenge the warrantless search of the house, which occurred with the consent of Ms. Gonzales, because he was temporarily staying there and thus had a legitimate expectation of privacy. Dkt. 18-1 at 2. He also argues that the warrantless search was unlawful because police did not obtain consent from each co-habitant who was present, as the record demonstrates. *Id.*

Petitioner does not establish that the state court decisions were contrary to or an unreasonable application of clearly established federal law, or that they were based on an unreasonable determination of the facts. As an initial matter, to the extent petitioner seeks to challenge the Court of Appeals' automatic standing ruling, which was based on Washington law, he cannot prevail because federal habeas courts do not consider alleged errors in state law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to

reexamine state-court determinations on state-law questions."). Petitioner's standing argument

fails because he does not present clear and convincing evidence to rebut the state courts' factual

determination that he did not live in the house and was instead staying in the garage. The

"overnight guest" exception does not apply because there is no evidence that he was ever invited

to stay in the house. Petitioner's argument that the warrantless search was invalid because police

failed to obtain consent from each co-habitant who was present also fails. As noted above, if one

co-habitant consents, other co-habitants who are present must expressly refuse to allow the

search. *Randolph*, 547 U.S. at 122-23; *Moore*, 770 F.3d at 813. No such express refusal

occurred here. Ground 8 should be DENIED.

D.    Right to an Impartial Jury (Ground 7)

Petitioner claims that his due process rights were violated when the trial court denied his

motion for a mistrial based on an impartial jury. Dkt. 6 at 15. During the trial, some of the

jurors informed the court that they were concerned by people they thought were petitioner's

family and friends writing down license plate numbers of cars in the juror parking lot. *See* Dkt.

12, Ex. 33 at 568-620. Petitioner's counsel moved for a mistrial, arguing that there was a risk the

jury would make its decision based on extraneous facts. *Id.* at 574-75. The court denied

petitioner's motion but agreed to question the 13 jurors individually regarding whether there

were discussions in the jury room regarding activities going on outside the courthouse. *See id.* at

576, 587. Ten jurors stated that there were discussions, but three denied knowledge of any

discussions. *Id.* at 587-618. One juror expressed concern about whether "we could be identified

easily if there was an issue," and another expressed "concerns about safety." *Id.* at 592, 600-601.

All of the jurors, however, stated that they could be fair and impartial and decide the case based

on the evidence presented. *Id.* at 587-618. After the judge had finished questioning all of the

jurors, petitioner's counsel stated that she did not have any concerns about juror bias. *Id.* at 619-20.

Trial by an impartial jury is fundamental to the fair administration of criminal justice. *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Where allegations of juror impartiality are made, the remedy is to provide "a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982); *see also Remmer v. United States*, 347 U.S. 227, 229-30 (1954). "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith*, 455 U.S. at 217. Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

The burden is on the defendant to establish that a juror lacks impartiality.[2] *See Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *Smith*, 455 U.S. at 215. The trial judge's finding on whether a juror is biased "is based upon determinations of credibility that are peculiarly within a trial judge's province," and therefore, such a finding constitutes a "factual issue[]" that is subject to the presumption of correctness under § 2254(e)(1). *Wainwright*, 469 U.S. at 428-29. The trial judge's finding of impartiality "deserves a high measure of deference and may be set aside only if it lacks even fair support in the record." *Rushen v. Spain*, 464 U.S. 114, 120 (1983) (internal quotations, citations, and alterations omitted).

On direct review, the Court of Appeals denied petitioner's biased jury claim, explaining as follows:

> Benitez argues he was entitled to a mistrial based on evidence that several jurors
> expressed concern about possible friends or family members of the defendant

---

[2] Petitioner mistakenly asserts that it is the State's burden to show that the discussions between the jurors were harmless. Dkt. 18-1 at 27.

milling around their parking area during lunch and after court.  At least two jurors suggested they were concerned or intimidated.  A trial court should grant a mistrial only when the irregularity is so prejudicial that nothing short of a new trial will ensure the defendant of a fair trial.  *State v. Weber*, 99 Wn. 2d 158, 165, 659 P.2d 1102 (1983).  Here, the trial court stated:

> If you want me to interview the individual jurors [who have expressed concern], I can attempt to do that without tainting the panel.  But simply a concern that someone is watching them in the parking lot is . . . not a discussion or deliberation of the case, in my mind, and based on any case law that I'm aware of.

The trial court also noted: "I will be happy to consider any type of remedial instruction, but I think that will only emphasize the matter.  There may be many jurors that have not expressed any concerns and aren't aware of these concerns being expressed."  Ultimately, the trial court decided to speak with the jurors individually about any concerns.  After those conversations, the trial court was persuaded that the jurors could be fair and impartial in deciding the case free from any outside influence.  Benitez also fails to prove that the stated concerns prejudiced his trial.  The trial court was in the best position to evaluate the impact of the jurors' stated concerns.  We hold that the trial court properly exercised its discretion in denying Benitez's motion for a new trial.

Dkt. 12, Ex. 2 at 25-26.

Petitioner argues that there were serious questions regarding whether all of the jurors answered the trial judge's questions honestly because three of them denied any discussions of activities outside the courthouse.  Dkt. 18-1 at 26.  He also contends the evidence that some jurors were concerned by the actions of petitioner's presumed family and friends demonstrated that the jurors already had determined that he "was a criminal-type who might be trying to intimidate them or cause them harm . . . ."  *Id.*  Petitioner asserts that the jurors' testimony that they could be fair and impartial cannot overcome their predetermination of his character or guilt.  *Id.*

Although petitioner questions the trial judge's finding that no outside influences tainted the jurors' impartiality, there is more than "fair support" in the record for this finding.  *See Rushen*, 464 U.S. at 120.  As noted above, each of the jurors stated under oath that they could be

fair and impartial and decide the case only on the evidence introduced at trial. Petitioner's assertion that three of the jurors lied when they claimed they were not aware of any discussions and therefore lied when they asserted their ability to fairly judge the case is nothing more than speculation. Petitioner fails to show that the trial judge's factual determination was unreasonable or that the Court of Appeals' decision was contrary to or an unreasonable application of clearly established federal law. Ground 7 should be DENIED.

E.      Admission of Evidence (Ground 9)

Petitioner claims that the State violated his due process rights by introducing evidence of his prior convictions, evidence of gang activity, and a photograph of him holding a toy gun.[3] Dkt. 6 at 18; Dkt. 18-1 at 3-12. The Commissioner rejected each of these claims, concluding that the trial judge did not inform the jury of petitioner's specific prior convictions, petitioner was not prejudiced by the admission of the gang evidence, and the photograph of him with a toy gun was relevant and not unduly prejudicial. Dkt. 12, Ex. 22 at 4-6.

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995)); *see also Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) (when considering due process claims based on evidentiary rulings, the test is whether the challenged evidence "so infected the trial with unfairness as to make the resulting conviction a denial of due process") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Under AEDPA, however, even clearly erroneous

---

[3] Respondent argues that because the Washington courts held that petitioner waived these claims, this Court cannot consider them. Dkt. 10 at 31. On habeas review, the Court reviews the state courts' last reasoned decision, which in this instance is the Commissioner's decision. Although the Commissioner found that it was "doubtful" petitioner could raise these claims in a personal restraint petition where there was no objection at trial, she nevertheless went on to consider the merits. Dkt. 12, Ex. 22 at 5-6. Because the Commissioner did not rely on waiver, neither will this Court.

admissions of evidence that render a trial fundamentally unfair may not permit the grant of

federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by

the Supreme Court. 28 U.S.C. § 2254(d); *Holley*, 568 F.3d at 1101.

"[T]he Supreme Court has made very few rulings regarding the admission of evidence as

a violation of due process." *Holley*, 568 F.3d at 1101. "Although the Court has been clear that a

writ should be issued when constitutional errors have rendered the trial fundamentally unfair

. . . , it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

constitutes a due process violation sufficient to warrant issuance of the writ." *Id.* (citation

omitted). Likewise, it has not held that admission of "prior crimes" evidence to show propensity

to commit a charged crime violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 75 n.5

(1991) (expressing no opinion on whether a state law would violate the Due Process Clause if it

permitted the use of "prior crimes" evidence to show propensity to commit a charged crime).

Thus, in a case involving a habeas challenge to the admission of evidence based on relevance

and prejudice, the Ninth Circuit held, "Absent such 'clearly established Federal law,' we cannot

conclude that [a] state court's ruling [on admission of evidence] was an 'unreasonable

application.'" *Id.* (citing *Carey v. Musladin*, 549 U.S. 70, 77 (2006)). Accordingly, where

AEDPA's deferential standard applies to an admission-of-evidence claim, the claim generally

must fail because the state court's reasoning cannot be contrary to, nor an unreasonable

application of, non-existent or un-established Supreme Court precedent. *See id.*

Given these standards, petitioner cannot prevail on his habeas claim that the trial court

violated his due process rights by allowing evidence of his prior crimes, testimony regarding

gang activity, and a photograph of him with a toy gun. In rejecting these claims, the

1  Commissioner did not unreasonably apply Supreme Court precedent because the Supreme Court

2  has not held that the admission of such evidence violates due process. *See id.*

3  Furthermore, the state court's decision is not based on an unreasonable determination of

4  the facts. In rejecting petitioner's claim that the trial court improperly disclosed his prior

5  convictions, the Commissioner found that his specific prior convictions were not disclosed:

> Mr. Benitez next contends that his right to a fair trial was violated when his prior
> convictions were disclosed to the jury. Mr. Benitez stipulated to the fact that he
> had at least one prior conviction for a serious offense, a necessary element of
> unlawful possession of a firearm, but the stipulation apparently provided that the
> nature of the offense would not be disclosed to the jury. As to the prior
> convictions, Mr. Benitez claims that the trial court read to the jury an unredacted
> version of the charges that mentioned the prior convictions. Mr. Benitez cites to a
> copy of the second amended information in support of his argument. Pet. Ex. 11.
> But the record provided by the State in response demonstrates that the trial court
> properly read a redacted version of the second amended information to the jury
> when announcing the unlawful possession of firearms charges, referencing as to
> each count only that Mr. Benitez had previously been convicted of a "serious
> offense." Resp. Ex. G. Accordingly, Mr. Benitez fails to demonstrate any
> constitutional violation as to this claim.

Dkt. 12, Ex. 22 at 4. The record supports the Commissioner's factual determination that the trial

judge properly read the charges to the jury. Dkt. 12, Ex. 12 at Appx. G.

Petitioner does not rebut this determination with clear and convincing evidence. Instead,

he argues that although he originally claimed the inadvertent disclosure occurred during opening

statements, he now "believes that disclosure may have happened during voir dire." Dkt. 18 at 11

n.2. Petitioner did not request transcripts for opening statements or voir dire in the state courts.

*See* Wash. R.A.P. 9.2(b) (requiring indigent defendants to obtain a trial court order directing

transcripts of opening statements and voir dire). He now asks this Court to order transcripts so

that this claim can be properly reviewed.

Rule 7 of the Rules Governing § 2254 cases allows the district court to expand the record

without holding an evidentiary hearing. The requirements of § 2254(e)(2) apply to requests to

expand the record.  *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005), *overruled on other grounds by Daire v. Lattimore*, 812 F.3d 766, 767 (9th Cir. 2016) (citing *Holland v. Jackson*, 542 U.S. 649, 653 (2004)).  That statute provides that a habeas petitioner is not entitled to an evidentiary hearing where he has failed to develop the factual basis of a claim in the state courts, unless the claim relies on (a) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence.  28 U.S.C. § 2254(e)(2); *see Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005).  Under AEDPA, "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  Because petitioner did not ask the state courts for the transcripts, he did not act diligently.  Therefore, he failed to develop the factual basis for his claim within the meaning of § 2254(e)(2).  *See id.*  Neither of the statutory exceptions apply.  *See* 28 U.S.C. § 2254(e)(2)(A). Petitioner is not entitled to expand the record.  Ground 9 should be DENIED.

F.  Double Jeopardy (Ground 10)

Petitioner claims that the trial court violated the Double Jeopardy Clause by entering three convictions for Possession with Intent to Deliver a Controlled Substance, all in violation of RCW 69.50.401(1) and (2)(a).  Dkt. 6 at 20; Dkt. 18-1 at 22-24.  The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend V.  The Double Jeopardy Clause protects against both successive prosecutions and successive punishments for the same criminal offense.  *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *United States v. Dixon*, 509 U.S. 688, 696 (1993).  Where multiple punishments are imposed in a single criminal trial, the role of the Double Jeopardy

Clause "is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977); *see also Missouri v. Hunter*, 459 U.S. 359, 366 (1983) ("With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.").

When a defendant is charged with committing a series of acts proscribed by a single statute, the Court inquires into the appropriate "unit of prosecution" in order to protect against multiple convictions for what, in fact, was only a single criminal violation. *Ladner v. United States*, 358 U.S. 169, 173-78 (1958); *Bell v. United States*, 349 U.S. 81, 82-83 (1955). By contrast, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The touchstone for both tests is statutory language and legislative intent. *See, e.g.*, *Garrett v. United States*, 471 U.S. 773, 778-79 (1985); *Sanabria v. United States*, 437 U.S. 54, 69-70 (1978).

The Commissioner considered and rejected petitioner's Double Jeopardy claim, explaining:

> [A]s to the convictions for possession with intent to deliver heroin, possession with intent to deliver cocaine, and possession with intent to deliver MDMA, Mr. Benitez argues the legislature intended only one unit of prosecution for possession of controlled substances in violation of RCW 69.50.401 where the substances were under his dominion and control at the same time. Double jeopardy principles protect a defendant from being convicted twice under the same statute for committing just one unit of the crime. *State v. Adel*, 136 Wn. 2d 629, 636, 965 P.2d 1072 (1998). Mr. Benitez attempts to analogize his multiple convictions for possession of different controlled substances to the situation in *Adel*, where this court held that the provision in the possession statute that "any person found guilty of possession of forty grams or less of marihuana shall be guilty of a misdemeanor" defined the unit of prosecution as marijuana within a defendant's

actual or constructive possession, and did not authorize multiple convictions based upon a drug being stashed in multiple places. *Id.* Mr. Benitez argues that because each conviction was based on possession of a controlled substance in violation of RCW 69.50.401, and these substances were under his dominion and control at the same time, possession of the three controlled substances was just one criminal act.

Under *State v. Calle*, 125 Wn. 2d at 777-78, Washington uses the "same evidence" test to determine whether a defendant's double jeopardy rights are implicated. Under the test, if each offense *as charged* contains elements not included in the other, then the double jeopardy rights are not implicated because they do not rely on the same evidence. Here, the State charged Mr. Benitez with three counts of possession with intent to deliver, but each one delineated a different controlled substance: heroin, cocaine, and MDMA. Pet., Ex. 11.

Mr. Benitez argues that each delineated drug falls under the same penalty and thus is not an essential element that need be charged, and therefore all three are merely convictions for possession with intent to deliver a controlled substance. *See State v. Eaton*, 164 Wn. 2d 461, 468-70, 191 P.3d 1270 (2008) (J.M. Johnson, J., concurring). But by charging possession with intent to deliver a specific narcotic with a higher sentencing range than a normal controlled substance, the charge makes the identity of the drug and essential element of the crime. *State v. Sibert*, 168 Wn. 2d 306, 312, 230 P.3d 142 (2010). For example, as *Sibert* explains, many controlled substances will fall within a five-year sentencing maximum and thus need not be specifically identified in the charging document. *Id.* But when the State charges possession with intent to deliver methamphetamine (or any other similar chemical substance), the sentencing range increases to a 10-year maximum. *Id.* Under those circumstances, the identity of the controlled substance becomes an essential element of the crime that must be charged. *Id.* Both the lead opinion and the dissenting opinion agree on this point. *See* lead opinion, *id.* at 312; dissent, *id.* at 318.

Here, each charged substance had a 10-year maximum, and thus each charge required the identity of the substance to be both charged and proven beyond a reasonable doubt. Accordingly, under the "same evidence" test, the State was required to prove the essential element of cocaine for one charged crime, heroin for another, and MDMA for the third charged crime. Because each charge required different evidence, there was no implication of double jeopardy principles.

Dkt. 12, Ex. 22 at 8-9 (emphasis in original).

Petitioner argues that the Commissioner improperly applied *Blockburger*'s "same evidence" test rather than the "unit of prosecution" test. Dkt. 18-1 at 23-24. He contends that

his three convictions for Possession with Intent to Deliver a Controlled Substance stem from a single violation of RCW 69.50.401(1) and (2)(a), and arose from the same time, place, and conduct. *Id.* at 23. According to petitioner, the fact that each charge identified a different narcotic is immaterial because all three charges were based on a single statutory provision. *Id.* at 24.

The Court need not determine which test applies because under either, the Commissioner's rejection of petitioner's double jeopardy claim is neither contrary to nor an unreasonable application of clearly established federal law. The Court must defer to the Commissioner's determination, based on state law, that the specific controlled substance was an essential element of each different conviction. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Given this determination, the Commissioner reasonably concluded, under *Blockburger*, that there was no double jeopardy violation because different evidence was required to convict petitioner of each offense.

And even if *Blockburger* does not apply, as petitioner argues, the result is the same under the "unit of prosecution" test. Petitioner was charged with and convicted of violating RCW 69.50.401(1), which states: "Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance." The statute defines the object of the offense as "a controlled substance." RCW 69.50.401(1), (2)(b). "By prefacing the objects of the offense with 'a,' [the statute] expresses an unambiguous [legislative] intent to make each controlled substance a unit of prosecution." *United States v. Vargas-Castillo*, 329 F.3d 715, 721 (9th Cir. 2003) (analyzing similar language in the federal controlled substances act). The statute "encompasses singular, individualized activity and

unambiguously defines the unit of prosecution in singular terms." *Id.* at 722. Accordingly,

petitioner's conviction of three counts of Possession with Intent to Distribute a Controlled

Substance, each based on a different controlled substance, complies with constitutional double

jeopardy requirements. Ground 10 should be denied.

G.    Conflict of Interest (Ground 11)

Petitioner claims that his trial counsel had a conflict of interest, in violation of the Sixth

Amendment, because she represented a potential witness in an unrelated case. Dkt. 6 at 22; Dkt.

18 at 22-28. Petitioner claims that on the day he was arrested, he rented an apartment from Sonia

Flores, an apartment manager, who could have testified about the rental, thereby establishing that

petitioner had his own residence and was not staying at the Cantu/Gonzales residence. Dkt. 18 at

10. At some point before trial, petitioner's counsel informed him that she was representing Ms.

Flores on charges of theft from tenants' rent money. *Id.* Contrary to petitioner's wishes, counsel

did not call Ms. Flores to testify on his behalf. *Id.* at 10-11.

The Sixth Amendment right to counsel includes the "correlative right to representation

that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). To establish

ineffective assistance of counsel based on a conflict of interest, a petitioner who did not raise an

objection at trial "must demonstrate that an actual conflict of interest adversely affected his

lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). An "actual conflict," for

purposes of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's

performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). "[T]he possibility of conflict is

insufficient to impugn a criminal conviction." *Sullivan*, 446 U.S. at 350. If a petitioner shows

that a conflict of interest existed and that it adversely affected counsel's performance, prejudice

will be presumed, and the petitioner need not show a reasonable probability that, but for

1  counsel's conflict of interest, he would have been acquitted.  *Id.* at 349-50; *Mickens*, 535 U.S. at

2  171-72.

3          The Court of Appeals rejected petitioner's conflict of interest claim:

4          Benitez contends that defense counsel had a conflict of interest because she
        also represented a potential witness in his case.  Benitez argues that he was

5        renting an apartment from Sonia Flores, who could testify that he was not living
        at Cantu and Gonzales's house at the time of the crimes.  He asserts that he paid

6        Flores a deposit which she did not return.  He claims that Flores was later
        prosecuted for the theft of apartment tenants' money and defense counsel

7        represented her in that matter.

8          In order to demonstrate ineffective assistance, a defendant must show that a
        conflict of interest adversely affected trial counsel's performance.  <u>State v.</u>

9        <u>Dhaliwal</u>, 150 Wn. 2d 559, 570, 79 P.3d 432 (2003).  Benitez fails to do so.  He
        asserts that defense counsel "was placed in a position where she had to slight my

10       defense to protect Sonia" by "choosing not to call Sonia to testify for fear of
        incriminating her."  But Benitez fails to show that Flores' testimony would have

11       been helpful to his defense.  He provides no affidavit from Flores nor any other
        witness who would have testified that, contrary to the claims of Gonzales, he was

12       not living at the Burlington home.  Benitez does provide copies of receipts made
        out to someone named "Vallejo" from Sonia Flores for the amounts of $250 and

13       $680.  But these receipts are dated October 26, 2009, two days <u>after</u> Benitez was
        arrested, and thus do not establish that Benitez was renting an apartment from

14       Flores at the time of the crimes.

15  Dkt. 12, Ex. 20 at 11.  The Commissioner also rejected petitioner's conflict of interest claim,

16  concluding that petitioner failed to show any error in the Court of Appeals' logic.  Dkt. 12, Ex.

17  22 at 3-4.

18          Petitioner reiterates the arguments he presented to the Court of Appeals.  Dkt. 18 at 25.

19  He further argues that the state courts failed to inquire into whether his and Ms. Flores's interests

20  diverged and whether trial counsel's performance was affected by her representation of Ms.

21  Flores.  *Id.* at 25-26.  He contends that the state courts improperly focused on whether Ms.

22  Flores's testimony would have been "helpful" or "advanced" his defense, rather than focusing on

23

how the conflict affected counsel's performance. *Id.* at 26. Petitioner asserts that the state courts

improperly required him to show prejudice, contrary to *Sullivan*. *Id.*

Petitioner fails to show that the state courts' adjudication of his claim was contrary to or

an unreasonable application *Sullivan* or *Mickens*.[4] The Court of Appeals properly identified the

legal standard, explaining that petitioner was required "to show that a conflict of interest

adversely affected trial counsel's performance." Dkt. 12, Ex. 20 at 11. The court reasonably

concluded that counsel's performance was not affected because Ms. Flores's testimony would

not have been helpful to petitioner's defense given that the evidence showed he was not living in

the newly rented apartment at the time of his arrest. *Id.* While petitioner characterizes the state

court decisions as improperly requiring him to establish prejudice, the decisions merely

concluded that trial counsel was not affected by her representation of Ms. Flores because Ms.

Flores's testimony did not advance petitioner's case. *See United States v. Wells*, 394 F.3d 725,

733 (9th Cir. 2005) (to show actual conflict resulting in an adverse effect, defendant must

demonstrate "that some plausible alternative defense strategy or tactic might have been pursued

but was not and that the alternative defense was inherently in conflict with or not undertaken due

to the attorney's other loyalties or interests." (internal quotation marks omitted)); *United States v.

Shwayder*, 312 F.3d 1109, 1118 (9th Cir. 2002) (alternatively describing the standard as

requiring "that counsel was influenced in his basic strategic decisions" by the conflict (internal

quotation marks omitted)). Ground 11 should be DENIED.

---

[4] Given this conclusion, the Court need not address respondent's argument that the Supreme Court's conflict of interest jurisprudence is clearly established law only for cases involving concurrent representation of multiple defendants in the same criminal manner, and therefore does not apply in this case. Dkt. 10 at 39-40 (collecting Ninth and Sixth Circuit cases that have interpreted *Mickens* as limiting the applicability of *Sullivan*).

## V. EVIDENTIARY HEARING

Petitioner asks the Court to hold an evidentiary hearing on his conflict of interest, evidentiary, and ineffective assistance of counsel claims.  Dkt. 18 at 16-19.  Because his claims can be resolved by reference to the state court record, as discussed above, an evidentiary hearing is not necessary.  *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.").

## VI. CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge.  A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Under this standard, the Court concludes that a certificate of appealability should be denied as to all of petitioner's grounds for relief.

## VII. CONCLUSION

The Court recommends petitioner's habeas petition be DENIED without an evidentiary hearing and this action be DISMISSED with prejudice.  The Court further recommends that a certificate of appealability be DENIED as to all of petitioner's grounds for relief.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **August 31, 2017**.  Failure to file objections

within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **September 1, 2017.**

This Report and Recommendation is not an appealable order.  Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

Dated this 10th day of August, 2017.

James P. Donohue

JAMES P. DONOHUE
Chief United States Magistrate Judge